# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **LANDMARK AMERICAN** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 07-CV-0535-MJR** |
| | ) | |
| **GREEN LANTERN ROADHOUSE** | ) | |
| **LLC, LINDA KRATT, and** | ) | |
| **LOUIS BUENNEMEYER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER AND MEMORANDUM

**REAGAN, District Judge:**

### A.  Background and Introduction

On July 25, 2007, Landmark American Insurance Company filed this declaratory judgment action, invoking subject matter jurisdiction under 28 U.S.C. § 1332 (Doc. 2).  The action arises out of an insurance policy that Landmark issued to Green Lantern Roadhouse, LLC on December 28, 2006 with respect to Green Lantern's commercial business, which was located on property owned by Linda Kratt (see Doc. 2, Exh. B).  According to Landmark, Green Lantern made a false warranty on its application that it had a central station burglar alarm at the property.  Landmark also claims that the policy explicitly required Green Lantern to have a central station burglar alarm.  Finally, Landmark alleges that Green Lantern misrepresented on its application that a central station fire alarm was installed on the premises.

In fact, the property had neither a central station burglar or fire alarm, and on June 5, 2007, the property was destroyed by fire resulting in damage in excess of $500,000.  Landmark refuses to pay on the Defendants' claims and seeks to have the policy declared void and rescind it.

Green Lantern and Kratt[1] counterclaimed, seeking enforcement of the policy (Docs. 14 & 63).[2]

Defendants argue that Landmark waived any misrepresentation because it conducted an inspection of the premises in February 2007 and provided Green Lantern with a list of specific remedial measures which, if not taken, would result in cancellation of the policy. However, Landmark did not require any action at that time with respect to the burglar or fire alarms to maintain continuation of the policy. Green Lantern further argues that no misrepresentation occurred because its December 27, 2006 application informed Landmark that neither alarm was operational, but rather that Green Lantern was in the process of soliciting bids. Kratt argues that regardless of any potential wrongdoing by Green Lantern, she is an innocent insured to whom Landmark owes payment under the policy.

On November 21, 2008, Landmark, Green Lantern, and Kratt filed cross-motions for summary judgment on the issue of liability (Docs. 72, 73, & 75). The motions were fully briefed as of January 9, 2009 (see Docs. 86–89). Having fully considered the parties' arguments, the Court hereby **DENIES** Landmark's motion (Doc. 73), **GRANTS** Kratt's motion (Doc. 72), and **GRANTS IN PART AND DENIES IN PART** Green Lantern's motion (Doc. 75).

### B. Standards Governing Motions for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Breneisen v. Motorola, Inc.*, 512 F.3d 972 (7th Cir. 2008) (citing FED. R. CIV. P. 56(c); *Celetex Corp. v. Catrett*, 477 U.S. 317, 322-

---

[1] Defendant Kratt claims that she and Defendant Buennemeyer are additional insureds on the policy. Green Lantern leased the property in question from Kratt for the purpose of running a bar and grill. Kratt purchased the property from Buennemeyer in 2002, but the entire purchase price had not yet been paid at the time of the fire.

[2] Buennemeyer did not file a counterclaim against Landmark.

23 (1986); *Krieg v. Seybold*, **481 F.3d 512, 516 (7th Cir. 2007)).**

Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial. *Oest v. IDOC*, **240 F.3d 605, 610 (7th Cir. 2001);** *Moore v. J.B. Hunt Transport, Inc.*, **221 F.3d 944, 950 (7th Cir. 2000).**

In ruling on a summary judgment motion, this Court must construe the evidence and all inferences reasonably drawn therefrom in the light most favorable to the non-moving party. *Tas Distribution Co., Inc. v. Cummins Engine Co., Inc.*, **491 F3.d 625, 630 (7th Cir. 2007);** *Reynolds v. Jamison*, **488 F.3d 756, 764 (7th Cir. 2007).**

The parties have filed cross-motions for summary judgment. The United States Court of Appeals for the Seventh Circuit has explained that when cross-motions for summary judgment are filed, "we look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Diaz v. Prudential Ins. Co. of America*, **499 F.3d 540, 643 (7th Cir. 2007) (quoting** *Santaella v. Metropolitan Life Ins. Co.*, **123 F.3d 456, 461 (7th Cir. 1997)).**

## C. Governing Law

As a federal court exercising diversity jurisdiction, this Court applies federal law in resolving procedural and evidentiary issues, and Illinois law with respect to substantive law. *Bevolo v. Carter*, **447 F.3d 979, 982 (7th Cir. 2006) (citing** *Colip v. Clare*, **26 F.3d 712, 714 (7th Cir. 1994)).** As such, this Court applies Illinois's choice-of-law rules to determine the applicable substantive law. *See Hinc v. Lime-O-Sol Company*, **382 F.3d 716, 719 (7th Cir. 2004);** *Kohler v. Leslie Hindman, Inc.*, **80 F.3d 1181, 1184 (7th Cir. 1996)**. Illinois follows the RESTATEMENT

(Second) of Conflict of Laws in making such decisions. *Midwest Grain Products of Illinois, Inc. v. Productization, Inc.*, 228 F.3d 784, 787 (7th Cir. 2000).

> The Supreme Court of Illinois has explained:
>
> Absent an express choice of law, insurance policy provisions are generally "governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract."

*Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 655 N.E.2d 842, 845 (Ill. 1995) (quoting *Hofeld v. Nationwide Life Ins. Co.*, 322 N.E.2d 454, 458 (Ill. 1975)). Here, Landmark's policy was delivered in Illinois to Green Lantern, an Illinois limited liability company, and the policy covered property located in Illinois. Accordingly, the Court applies Illinois substantive law to the claims herein. *See Supreme Laundry Serv., LLC v. Hartford Cas. Ins. Co.*, 521 F.3d 743, 746 (7th Cir. 2008).

## D. Analysis

Landmark claims that Green Lantern made a false warranty and a material misrepresentation on its application by stating that the property in question was equipped with central station burglar and fire alarms. Landmark also argues that Green Lantern breached a condition of the policy by not installing a central station burglar alarm. As a result, Landmark argues that it has a right to rescind the insurance policy as to all Defendants. Additionally, Landmark argues that the Defendants' affirmative defense of waiver is inapplicable because in Illinois, an insurance policy is void *ab initio* where an insured makes a misrepresentation in the negotiation of the policy or where a condition of the policy is breached. In any case, Landmark asserts that its conduct cannot be taken as a waiver of its right to rescind.

Green Lantern argues that it did not make a false warranty or material misrepresentation on its application. Even if it did, Green Lantern claims that the policy is merely voidable under Illinois law, and that Landmark waived any right to rescission it may have had by failing to promptly rescind the policy once it was aware that the property did not have a central station burglar and fire alarms. Green Lantern also argues that it is the only insured under the Commercial Property Coverage Part of the policy, such that neither Kratt nor Buennemeyer are entitled to recovery under the policy.

Kratt argues that she is, in fact, an additional insured under the policy, and that her innocence with respect to the alleged breach of condition, false warranty, and misrepresentation entitles her to recover under the policy.

Because there appears to be no disagreement that Green Lantern breached the condition of the policy requiring that a functioning burglar alarm must be maintained, the Court begins with the question of whether the breach of that condition alone is sufficient to void the policy.

## 1. Whether the Breach of a Condition Bars the Insureds from Recovering

Section 154 of the Illinois Insurance Code provides:

No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company. . . .

**215 ILCS 5/154.** Here, Green Lantern does not contest that it breached the policy condition requiring it to maintain a burglar alarm. The policy explicitly states that "[a]s a condition of this

insurance, you are required to maintain the protective devices and/or services listed in the Schedule above" (Doc. 2-5, p. 15, Exh. B2). The Schedule identifies the applicable protective safeguard as "BR-1," which is designated as "Automatic Burglary Alarm, protecting the entire building, that signals to: (1) An outside central station; or (2) A police station" (Doc. 2-5, p. 15, Exh. B2). Green Lantern admits that no central station burglar alarm was maintained on the property during the term of the policy (Thoele Dep., Doc. 77-6, Exh. C, pp. 78–79).

Landmark argues that under Illinois law, a policy is considered void *ab initio* when an insured breaches a condition explicitly provided for in the policy. The statute does not explicitly state that a misrepresentation, false warranty, or breach of a condition makes a policy void *ab initio*. In fact, it states that such conduct does not permit avoidance of the policy unless certain other elements are established.

The Court cannot find, and Landmark does not cite, any authority indicating that the breach of a condition voids an insurance policy *ab initio*. The literal reading of the statute certainly does not support that conclusion. And in contract law, breach of a condition would not typically have such a drastic effect on the parties' agreement.

Furthermore, the statute does not limit an insurer's ability to provide an insured with even more protection than the legislature gave. Indeed, here, the parties appear to have provided a separate remedy for the breach of the particular condition at issue. The policy provides that

> [Landmark] will not pay for loss or damage caused by or resulting from theft if, prior to the theft, you:
> 1. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or
> 2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.
> (Doc. 2-5, Exh. B2, p. 15).

In other words, the policy itself limits Landmark's remedy for Green Lantern's failure to comply with the condition that it maintain a central station burglary alarm to automatic denial of claims resulting from theft.

Thus, the Court finds that the mere breach of a condition within an insurance policy does not, in and of itself, void the policy *ab initio* under **215 ILCS 5/154**. Additionally, the Court notes that because the policy condition at issue here only permits Landmark to deny claims for losses resulting from theft, it does not serve as a basis for the denial of the Defendants' claims, which stem from damage to the property due to fire.

## 2. Whether Green Lantern Made a False Warranty or Misrepresentation on its Application

Next, the Court addresses whether a genuine issue of material fact exists as to whether Green Lantern's application included (1) a false warranty that the property was equipped with a central station burglar alarm, or (2) a material misrepresentation that the property was equipped with a central station fire alarm.[3]

### a. Relevant Facts

The following facts are undisputed, unless otherwise indicated. Ron and Arlene Thoele are the sole members of Green Lantern Roadhouse, LLC, an Illinois limited liability company. Green Lantern planned to operate a bar and grill on the property in question, which Green Lantern leased from Linda Kratt. In furtherance of this enterprise, Ron Thoele began renovations at some point in 2006. Green Lantern initially obtained insurance coverage on the property as a vacant building from Illinois Casualty Company, but that policy was cancelled in November 2006.

---

[3] Oddly, Green Lantern does not specifically seek summary judgment on the grounds that no false warranty or misrepresentation occurred, instead focusing its argument on the affirmative defense of waiver (*see* Docs. 75 & 77). However, in its response to Landmark's motion, Green Lantern does argue that it did not make any false warranty or misrepresentation on its application (Doc. 85).

Thereafter, efforts were made to obtain a new policy with the help of Kara Haarmann of Weis Insurance Agency, LLC (Weis), an insurance broker.

Initially, Haarmann made submissions to various insurance agencies seeking quotations for coverage of the property as a vacant building. At some point, she made a submission to Rich Nerison of Geo F. Brown & Sons, Inc. (Brown), which was Landmark's managing general agent in Illinois. However, on December 11, 2006, Haarmann sought a quote for insuring the property as an operating business. After soliciting additional information from Thoele, she submitted an application to Brown on December 14. The application form included boxes wherein the applicant was to provide information regarding any burglar or fire alarms installed

Though a copy of the application in the form it was submitted to Brown on December 14th is not available, the parties appear to agree on its content with respect the presence of burglar or fire alarms. Entries labeled "Burglar Alarm Type," "Certificate #," and "Expiration Date" were left blank. However, under "Burglar Alarm Installed and Serviced By," the application stated "ADT." The form also included boxes pertaining to the burglar alarm labeled "Central Station" and "With Keys," which were left unchecked. Additionally, under "Premises Fire Protection (Sprinklers, Standpipes, CO2/Chemical Systems)," the application stated "ADT." With respect to fire protection, there were boxes labeled "Central Station" and "Local Gong," but again they were left unchecked.[4]

Above the signature block, the form stated:

The undersigned is an authorized representative of the applicant and certifies that reasonable enquiry has been made to obtain the answers

---

[4] The difference between a "central station alarm" and a "local alarm" is that a central station alarm alerts an outside monitor, such as a security company or fire or police department, when the alarm is triggered. A local alarm merely sounds at the premises.

to the questions on this application. He/she certifies that the answers
are true, correct and complete to the best of his/her knowledge. (*See*
Doc. 73-8, Exh. F).

However, it is undisputed that Haarmann filled out the information on the form, and Thoele did not

sign the form until December 27, 2006. Thus, at the time of the December 14th submission, the

application was unsigned (Thoele Dep., Doc. 77-6, Exh. C, pp. 50–54, 139–40, 151–53, 157).

In fact, Thoele admits that though a burglar alarm system had been installed, it was

not monitored by an outside company or police department (Thoele Dep., Doc. 77-6, Exh. C., pp.

9–11, 15, 18–19, 32–33, 39, 53–54). The system was operational to the extent that when it was set

off, loud bells would ring inside the building (Thoele Dep., Doc. 77-6, Exh. C., pp. 15–17, 32–33,

149–50). Thoele believed that the alarm was an ADT system, because the alarm control box

indicated that the alarm was installed by ADT and had a phone number by which to contact ADT

for service (Thoele Dep., Doc. 77-6, Exh. C, pp. 57–60). However, the system did not include a fire

alarm (Thoele Dep., Doc. 77-6, Exh. C, pp. 18–19, 39, 55–60). Aside from smoke detectors, no fire

alarm was ever installed (*see* Harris Dep., Doc. 77-17, Exh. M, pp. 36–37). ADT did not have a

service contract covering the building's alarm system (Thoele Dep., Doc. 77-6, Exh. C, p. 41).

Rather, it was Thoele's intention at that time to solicit bids from various security companies so as

to have a central station burglar and fire alarm system installed at the premises (Thoele Dep., Doc.

77-6, Exh. C, pp. 41–46, 56–60, 69–72).

Based on the unsigned December 14th submission, Nerison provided an insurance

quote, which included theft coverage, for an operating business on behalf of Landmark Insurance

(Haarmann Dep., Doc. 77-7, Exh. D, pp. 103–04). On December 16th, Nerison revised the quote

to provide coverage for all of the property, with other minor changes. In receipt of the

quote, Haarmann met with Thoele on December 27, 2006. At that time, Thoele reviewed the

application and indicated that he would not sign it unless alterations were made regarding the alarm systems (Thoele Dep., Doc. 77-6, Exh. C, pp. 50–54, 139–40, 151–53, 157). Accordingly, after the original entry of "ADT" under "Premises Fire Protection," Haarmann added "Central Station Alarm to be activated — <u>Not</u> Sprinklered." (Thoele Dep., Doc. 77-6, Exh. C, pp. 55–56, 139–40). Thoele then signed the application and dated it "12/27/06." (Haarmann Dep., Doc. 77-7, Exh. D, pp. 96–97; Doc. 77-8, Exh. D, p. 274; Thoele Dep., Doc. 77-6, Exh. C, pp. 50–51, 139–40, 152–57). The signature block was located just below the following disclaimer:

> The undersigned is an authorized representative of the applicant and certifies that reasonable enquiry has been made to obtain the answers to the questions on this application. He/she certifies that the answers are true, correct and complete to the best of his/her knowledge (Doc. 73-8, Exh. F).

Haarmann admits that at the time the application was submitted on December 27th, she understood that a central station alarm was not operational at the premises, but rather only a local station burglar alarm was installed (Haarmann Dep., Doc. 77-7, Exh. D, pp. 128–38). Because burglar and fire protection are usually provided within a single central station alarm, she believed that her entry was sufficient to convey that neither alarm was active (Haarmann Dep., Doc. 77-7, Exh. D, pp. 128–38; Doc. 77-8, pp. 260–61, 275). And, in fact, there was not a central station burglar or fire alarm serviced by ADT, but rather only a local alarm.

On December 28th, Nerison bound coverage on behalf of Landmark. The Insurance Binder indicated that the term of the policy was one year (December 28, 2006 through December 28, 2007) (Doc. 73-9, Exh. G). Landmark argues that the coverage was based on the December 16, 2006 quote, and Nerison was unaware that modifications had been made to the application. However, the Insurance Binder stated:

> In accordance with your instructions, and in reliance upon the

-10-

statements made by the retail broker in the insured's application/submission, we have obtained insurance at your request as follows . . . .

(Doc. 73-9, Exh. G).

### b. Which Application Controls?

The first question the Court must confront is whether the December 14th or December 27th application controls. Unfortunately, Landmark raised this issue for the first time in its reply brief (Doc. 88). As a result, the Court does not have the benefit of a full briefing of the issue from all parties. Nonetheless, it is clear that the December 27th application is the relevant version for determining whether Green Lantern made a false warranty or misrepresentation on its application.

Landmark argues that its December 16, 2006 quote constituted an offer, and Green Lantern's signed application on December 27, 2006 constituted acceptance, upon which it bound coverage. Because its "offer" was based on the information provided as of December 14, Landmark claims that it only relied on that information and did not consider the December 27th application. As such, Landmark asserts that the Court must look to the December 14th application to decide whether a misrepresentation occurred.

Landmark's position that it could not have relied upon the December 27th application is undermined by several undisputed facts. First, the December 14th application was unsigned. It is clear from the parties' course of conduct that Landmark, through its agent Nerison, would not issue a policy without a signed application. Second, the December 28th Insurance Binder was issued only after Nerison received the signed application and accompanying documents. That Binder explicitly states that the insurance was obtained "in reliance upon the statements made by the retail broker in the insured's application/submission." It is impossible for the Court to overlook the fact

that at the time the Binder was issued, Nerison had received the signed application, which included the alteration regarding Green Lantern's fire alarm. Accordingly, the Court looks to the December 27th application in determining whether Green Lantern made a misrepresentation or false warranty in the course of obtaining its policy from Landmark.

### c. False Warranty

Next, the Court must determine whether there is a genuine issue of material fact as to the question of whether Green Lantern made a false warranty that the premises contained a "burglar alarm installed and serviced by ADT." There is not a wealth of cases in Illinois distinguishing false warranties from misrepresentations, but the basic legal difference is clear:

> A warranty in insurance enters into and is part of the contract, and must be literally true to permit a recovery on the policy while a representation is not part of the contract but an inducement thereto. A representation must relate to a material matter, and is only required to be substantially true.

*Whitehead v. Fleet Towing Co.*, 442 N.E.2d 1362, 1365 (Ill. App. Ct. 1982).

Landmark claims that the information relating to the burglar alarm in the application constitutes a warranty because the insurance policy itself required a burglar alarm as a condition of coverage. But this is a bit of a stretch, as the insurance policy actually requires more than the information contained in the application. The policy required that Green Lantern maintain an "Automatic Burglary Alarm, protecting the entire building, that signals to: (1) An outside central station; or (2) A police station" (Doc. 2-5, p. 15). The application does not go that far. It merely indicates that the premises contained a "burglar alarm installed and serviced by ADT." Obviously, Thoele cannot have meant to suggest that the alarm was a central station alarm by this entry alone, because there is a specific place where the applicant can check a box to indicate that the alarm is a central station alarm. The box marked "central station" was not checked.

Because the policy actually required more than was included on the application, Thoele's statement does not rise to the level of a warranty that became part of the contract itself. As no genuine issue of material fact exists as to Landmark's false warranty claim, the Court must grant summary judgment in favor of Green Lantern and against Landmark on this claim.[5]

### d.  Material Misrepresentation

The Court now turns to the question of whether there is a genuine issue of material fact that Green Lantern made a material representation on its application that the building was equipped with a fire alarm.  Under "Premises Fire Protection (Sprinklers, Standpipes, $CO_2$/Chemical Systems)," Green Lantern's December 27th application stated "ADT - Central Station Alarm to be activated — <u>Not</u> Sprinklered" (Doc. 73-8, Exh. F).  Landmark claims that this constitutes a material misrepresentation because the premises never contained any such alarm.

As the Court previously explained, **215 ILCS 5/154** permits an insurance company to avoid a policy where the insured made a misrepresentation in its written application that materially affects "the acceptance of the risk or the hazard assumed by the company."  It is clear that the risk of loss due to fire increases where there is no fire alarm, because it takes longer to detect the fire, which also means that it takes longer for the fire department to respond.  This is also true where the alarm is local rather than central station.

Indeed, testimony in the record clearly establishes that the absence of a central station fire alarm typically affects coverage.  Specifically, various witnesses testified that, under these circumstances, either the insured's premiums would increase or else the scope of coverage would be reduced (Warner Dep., Doc. 77-4, Exh. A, pp. 38–39, 62–63; Swiggum Dep., Doc. 77-5, Exh.

---

[5]  Landmark does not challenge the statement on the application as a material misrepresentation, so the Court need not address that issue.

B, pp. 68).  Indeed, even Kara Haarmann agreed that an underwriter relies on information regarding these alarms in providing a quote (Haarmann Dep., Doc. 77-8, Exh. D, p. 281).  Though the property might still be insurable without a fire alarm, the lack thereof obviously materially affects the risk.

Thus, the primary question before the Court is whether the application misrepresents the status of the fire alarm at the premises.  As a preliminary matter, the Court notes that above the signature block, the application states,

> The undersigned is an authorized representative of the applicant and certifies that reasonable enquiry has been made to obtain the answers to the questions on this application.  He/she certifies that the answers are true, correct and complete to the best of his/her knowledge.  (Doc. 73-8, Exh. F).

In *Golden Rule Insurance Co. v. Schwartz*, the Supreme Court of Illinois explained that the presence of language in an insurance application indicating that the information contained therein is true to the best of the applicant's "'knowledge and belief' . . . establishes a lesser standard of accuracy than that imposed under statutes akin to section 154." **786 N.E.2d 1010, 1016 (Ill. 2003).**  In applying this principle, the Court explained that by using the "knowledge and belief" language, the insurance company

> opted to include language in its application that had the effect of shifting the focus, in a determination of the truth or falsity of the applicant's statement, from an inquiry into whether the facts asserted were true to whether, on the basis of what he knew, the applicant believed them to be true.  Thus, the response given [on the application] must be assessed in the light of the applicant's actual knowledge and belief.

*Id.* **at 1016–17.**

Here, Ron Thoele certified that the information on the application was "true, correct, and complete to the best of [his] knowledge."  Accordingly, the Court focuses its inquiry on the

question of whether the information provided meets that standard, rather than simply asking whether the information was true.

Though it is a close call, the Court finds that a genuine issue of material fact exists as to whether Thoele's statement regarding the fire alarm was a misrepresentation. The application states "ADT - Central Station Alarm to be activated — Not Sprinklered" under "Premises Fire Protection." The entry could only be read to mean that no fire alarm was in place, but that a central station, non-sprinklered alarm would be installed. Even though Thoele's statement must be assessed based on its truth "to the best of his knowledge" at the time of his application, a fact question exists as to whether he actually intended to install a central station alarm. Thoele states that he planned to solicit bids on a central station alarm and in fact did so during the policy term. But, in fact, Thoele never did install and activate a fire alarm at the premises. Assessment of whether Thoele's statement constitutes a misrepresentation requires a credibility determination that may only be made by a jury.

Accordingly, the Court finds that genuine issues of material fact remain as to whether his statement that a central station fire alarm would be activated constitutes a misrepresentation.

### 3. Whether Landmark Waived Rescission Even if a Misrepresentation Occurred

The Court next addresses Green Lantern's affirmative defense of waiver. Green Lantern argues that, even if the application contained a misrepresentation, the policy is merely voidable and Landmark waived its right to rescind the policy. In response, Landmark argues that any material misrepresentation voids the policy *ab initio* as to all Defendants under Section 154. In addressing this issue, the Court must first determine whether the policy is void *ab initio* or voidable, before turning to the question of whether Landmark's conduct constitutes a waiver of its

right to rescind the policy.

### a.  Whether a Misrepresentation Voids the Policy *ab initio*

Though the distinction between contracts that are void *ab initio* and voidable is an important one, those in the legal profession sometimes overlook the difference.  In many cases, the lack of careful language may be inconsequential—a party can still avoid enforcement of the contract even if the alleged defect merely makes the contract voidable.  But where the defense of waiver is raised,

> [A] contract that is void *ab initio* is treated as though it never existed; neither party can choose to ratify the contract by simply waiving its right to assert the defect.  On the other hand, if a contract is merely voidable, a party can either opt to void the contract based upon that defect, or choose, instead, to waive that defect and ratify the contract despite it.

*Illinois State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, **821 N.E.2d 706, 713 (Ill. App. Ct. 2004).**

Landmark claims that the alleged misrepresentation, if proven, voids the policy *ab initio* under **215 ILCS 5/154**.  However, the cases cited by Landmark are vague as to the validity of this particular assertion.  In *TIG Ins. Co. v. Reliable Research Co., Inc.*, another court within this district granted summary judgment in favor of an insurance company where the insured failed to disclose a pending lawsuit against it on the application.  **228 F.Supp.2d 921 (S.D. Ill. 2002).**  The court's inquiry focused on whether the defendant had in fact made a material misrepresentation.  As a preliminary matter, and without analysis, the court explained that under Illinois law, "misrepresentations in an application for an insurance policy may be cause for voiding the policy. . . . [I]f the insured made a material misrepresentation or a misrepresentation was made with the intent to deceive on the application for insurance, the policy is void *ab initio*." *Id.* **at 926–27 (citing**

-16-

***Home Ins. Co. v. Dunn*, 963 F.2d 1023, 1026 (7th Cir. 1992)).** But the Court did not squarely confront the issue, and it does not appear that the defendant raised a defense of waiver.

Likewise, when the Seventh Circuit affirmed the District Court's decision, it was not asked to address the issue either. ***TIG Ins. Co. v. Reliable Research Co.*, 334 F.3d 630 (7th Cir. 2003).** In fact, the Court even offered a variation of the effect of a misrepresentation on the policy: "Illinois law ***permits an insurer to rescind*** an insurance policy if the insured's application for coverage contains a misrepresentation that was made with intent to deceive or that is material." ***Id.* at 635 (emphasis added).**

Similarly, in ***Golden Rule***, the Supreme Court of Illinois held that summary judgment was inappropriate because a genuine issue of material fact existed with respect to whether the defendant had in fact made misrepresentations on his application. **786 N.E.2d 1010.** In providing a background explanation of the effect of Section 154, however, the court merely noted that "[t]he statute establishes a two-prong test to be used in situations where insurance policies ***may be voided*** . . . a misrepresentation, even if innocently made, ***can serve as the basis to void a policy***." ***Id.* at 1015 (emphasis added).** But the statute itself was not even determinative of the issues before the court. As noted earlier, the court found that statements on an insurance application requiring that the applicant answer to the best of his "knowledge and belief" are subject to a lesser standard of accuracy than that imposed by Section 154. ***Id.* at 1016.**

Landmark's most persuasive arguments rely on ***Home Ins. Co. v. Dunn***. There, the president of a law firm (Cooper) obtained legal malpractice insurance for the entire firm. **963 F.2d 1023 (7th Cir. 1992).** One of the questions on the application asked whether he was aware of any past or present conduct that could result in a malpractice claim against the firm. Cooper answered

in the negative, even though he had been embezzling funds from the firm's clients. When a malpractice claim was brought against one of the firm's other attorneys, Home Insurance sought a declaratory judgment finding the policy void as a result of the misrepresentation. **Id. at 1024.**

While analyzing the policy under Section 154, the Seventh Circuit found the policy void *ab initio* as to all of the firm's attorneys due to Cooper's intentional misrepresentation on the application. And because the policy was void *ab initio*, other attorneys in the firm could not rely on a waiver of exclusion clause within the policy that one insured's wrongdoing would not deprive an innocent insured of coverage.

> Because the fraud was committed during the negotiation of the contract, no insurance policy existed. If there had been no fraud or misrepresentation on the application (if Cooper began his criminal acts after the policy was in force), the waiver of exclusion clauses would be valid. However, because no policy existed, the defendants may not now rely on the waiver provisions.

**Id. at 1026.** In other words, the Seventh Circuit placed great weight on the fact that the misrepresentation occurred before the policy was actually issued, such that it believed the misrepresentation on the application prevented the policy from going into effect in the first place.

But Green Lantern points to a more recent case decided by the Appellate Court of Illinois that includes a thorough analysis of the issue and holds differently. In ***Illinois State Bar Ass'n Mutual Ins. Co. v. Coregis Ins. Co.***, an attorney (Hubka) settled a client's personal injury lawsuit, but converted the funds to his own use rather than disbursing them to the client. **821 N.E.2d 706, 708 (Ill. App. Ct. 2004).** The Illinois Attorney Registration and Disciplinary Commission (ARDC) filed a complaint against him, and Hubka admitted that he failed to disburse the funds to his client. Five months later, Hubka submitted an application to Coregis for renewal of his malpractice insurance. However, on his application, Hubka stated that he was unaware of any

-18-

"'circumstance, act, error, omission or personal injury which may result in a claim' against him." *Id.* **at 708.** Coregis renewed the policy for the term of November 7, 1995 to November 7, 1996. Thereafter, the client sued Hubka, and the Illinois Supreme Court suspended him from the practice of law. Coregis ultimately sought a declaratory judgment that it owed no duty to defend or indemnify Hubka, in part because of Hubka's knowledge of a possible malpractice claim against him at the time he applied for renewal. *Id.* **at 709–10.** The trial court granted summary judgment in Coregis's favor, finding that Hubka's misrepresentations on his application made the policy void *ab initio*. *Id.* **at 711.**

Though the appellate court affirmed the entry of summary judgment in Coregis's favor, it explained that the trial court was incorrect in ruling that the policy was void *ab initio*. In doing so, the court gave a particularly thorough and well-reasoned explanation as to why misrepresentations on an insurance application are merely voidable under Section 154. Though the court did not cite the Seventh Circuit's decision in ***Dunn***, it rejected ***Dunn***'s reasoning that the time of the misrepresentation was of paramount importance. Instead, the court explained that

> [w]hether a defect in the formation of a contract renders that contract void *ab initio* or merely voidable depends upon the nature of that defect. For instance, if the subject matter of a contract is illegal, that contract is void *ab initio*. So too are contracts where one of the contracting parties exceeded its authority in entering into the pact.

*Id.* **at 712 (citations omitted).** However, the Court noted that "[o]ther defects . . . simply render the contract voidable." *Id.* **(citations omitted).** With respect to Section 154 specifically, the court analyzed the Illinois Supreme Court's decision in ***Golden Rule*** and explained:

> Nowhere in its analysis of the statute did the supreme court find that a material misrepresentation under section 154 renders a policy void *ab initio*. Instead, the court explained that section 154 "establishes a two-prong test to be used in situations where insurance polices *may*

*be voided.*" (Emphasis added.) *Golden Rule*, 786 N.E.2d 1010. It
appears, therefore, that while section 154 did limit the grounds upon
which an insurer can rescind a policy based upon a material
misrepresentation, it did not change the nature of that right.
Therefore, just as it was before section 154 was enacted, **a material
misrepresentation under section 154, which grants an insurer the
right to rescind the policy, renders the policy voidable, not void
*ab initio*,** and an insurer can waive this right if it does not invoke it
promptly.

**Id. at 715 (emphasis added).**

Recently, courts have followed the holding in ***Coregis*** rather than ***Dunn***. ***See Tower***
***Investors, LLC v. 111 East Chestnut Consultants, Inc.*****, 864 N.E.2d 927, 939 (Ill. App. Ct. 2007)**
**(citing *Coregis* for the proposition that "[f]raud in the inducement of a contract is a defect**
**which renders the contract voidable at the election of the innocent obligor.");** ***Travelers***
***Indemnity Co. v. Bally Total Fitness Holding Corp.*****, 448 F.Supp.2d 976, 981 (N.D. Ill. 2006)**
**(explaining that under Section 154, "the insurance policy is *voidable* if either (1) the insured**
**made a material misrepresentation or (2) the insured made a misrepresentation with the intent**
**to deceive.") (emphasis added).** Likewise, this Court finds the reasoning of ***Coregis*** persuasive
and controlling on this issue. Consequently, Green Lantern's alleged misrepresentations make the
instant insurance policy voidable under Illinois law, not void *ab initio*.

### b.  Whether Landmark Waived Rescission

Because the policy is merely voidable, the Court must now address Green Lantern's
affirmative defense that Landmark waived its right to rescission and ratified the policy in spite of
any misrepresentation.  "Waiver is defined as 'the voluntary relinquishment of a known right.'"
***Coregis*****, 821 N.E.2d at 717 (quoting *Lake County Grading Co. of Libertyville, Inc. v. Advance***
***Mechanical Contractors, Inc.*****, 654 N.E.2d 1109 (Ill. App. Ct. 1995)).** Additionally, one who seeks

to rescind a contract due to fraud or misrepresentation must promptly exercise that right.  *Id.*

> An unreasonable delay in taking the necessary steps to set aside a
> fraudulent contract will have the effect of affirming it.
>    . . . [A]n insurer waives its right to enforce a provision of the
> contract when its words or conduct are inconsistent with its intention
> to rely on the requirements of the policy.  For a court to find waiver
> of a policy defense requires the establishment of those facts that
> would show that it would be unjust, inequitable, or unconscionable
> to allow the insurer to assert the defense.

*Id.* **at 717 (citations omitted).**  The court found that these waiver rules "apply with equal force to

the waiver of a right to rescission."  *Id.* **at n.6.**

Landmark argues that it could not have waived its right to rescission because the

policy requires that any such waiver be made in writing.  The policy states:

> This policy contains all the agreements between you and us
> concerning the insurance afforded.  The first Named Insured shown
> in the Declarations is authorized to make changes in the terms of this
> policy with our consent.  This policy's terms can be amended or
> waived only by endorsement issued by us and made part of this
> policy (Doc. 2-3, Exh. B, p. 18).

However, this provision only provides that the policy's terms cannot be waived without an

endorsement.  The issue here is whether Landmark waived a right to rescission based on an insured's

misrepresentation in its application.  Thoele's representation about the existence of a fire alarm on

the application is not a term of the policy, and Green Lantern does not argue that Landmark waived

any policy terms.  The Court agrees that the policy provision regarding the waiver of policy terms

is inapplicable to the issue currently before the Court.

As a result, the Court now turns to the question of whether Landmark waived its right

to rescission.  The relevant facts, many of which have already been explained by the Court, are as

follows.  On December 27, 2006, Thoele signed an application for insurance from Landmark.  Under

"Premises Fire Protection," the application states: "ADT - Central Station Alarm to be activated —

Not Sprinklered."   On December 28, 2006, Landmark bound coverage based on its reliance on

Thoele's signed application.  The policy did not include any requirement that Green Lantern install

a central station fire alarm.  On February 1, 2007, an underwriting inspection was performed by

David Harris of Lakeside Inspections on behalf of Landmark (Doc. 77-18, Exh. N; Harris Dep., Doc.

77-17, Exh. M, pp. 17–21, 26–27).  The report specifically indicated that the fire alarm at the

property was "local" and that there was no sprinkler system (Doc. 77-18, Exh. N, p. 4).  Harris

provided the report to Rich Nerison of Geo F. Brown, recommending the removal of certain

materials from the kitchen to reduce fire hazards, cleaning the upstairs living area, and removal of

certain items from the basement (Doc. 77-18, Exh. N, p. 1).  No recommendations were made with

respect to the fire alarm.

On February 13, 2007, Nerison forwarded these recommendations to Kara Haarmann

of Weis Insurance, stating that failure to comply with the recommendations within 30 days would

result in cancellation of the policy (Doc. 77-18, Exh. N, p. 1; Haarmann Dep., Doc. 77-7, Exh. D,

pp. 162–67).  On June 5, 2007, a fire destroyed the property in question.  On June 11, 2007,

Landmark sent a letter to Thoele generally reserving its right to deny coverage (Doc. 73-10, Exh.

H).  On July 25, 2007, Landmark advised Green lantern that it was rescinding the policy and

denying coverage for the loss.

In discussing whether Landmark promptly rescinded the policy upon learning of the

misrepresentation in Green Lantern's application, the parties direct the Court to the *Coregis*

decision.  As the Court explained earlier, in that case, the ARDC filed a complaint against the

attorney (Hubka) in February 1995 alleging that he converted client funds.  Hubka admitted

wrongdoing, but neglected to include any reference to this conduct five months later when he applied for renewal of his malpractice insurance. **821 N.E.2d at 708.** Unaware of the wrongful conduct, the insurance carrier (Coregis) renewed the policy for one year. Thereafter, the client filed a malpractice suit against Hubka.

On August 8, 1996, the Illinois Supreme Court suspended Hubka. Within a month of learning about the suspension, Coregis notified Hubka that his policy would not be renewed. On September 30, 1996, Hubka asked Coregis to defend him in the malpractice suit, pursuant to his insurance policy. Within three days, Coregis notified Hubka that while it had assigned counsel to defend him, it also explicitly reserved its right to refuse to defend or indemnify him if certain exclusions in the policy were applicable. *Id.* **at 708–09.** Coregis also highlighted specific exclusions that it believed might apply, including the right to deny coverage for "any claim arising out of any act . . . occurring prior to the effective date of this policy if any insured knew or could have reasonably foreseen that such act . . . [m]ight be expected to be the basis of a claim or suit." *Id.* **at 709–10.** On August 14, 1997, Coregis filed a complaint seeking a declaratory judgment that it owed no duty to defend or indemnify the attorney in the malpractice suit.

The court found that Coregis's actions could not be reasonably construed as having waived its right to rescind. *Id.* **at 717.** The court focused on Coregis's immediate notification to Hubka that Coregis would not renew his policy, its immediate reservation of its right to rescind if certain exclusions applied, and its ultimate filing of the declaratory judgment. *Id.* **717–18.** The court determined that Coregis acted promptly in light of the specific steps taken by Coregis to notify Hubka that it believed that coverage could be denied.

Here, Landmark claims that ***Coregis*** supports the conclusion that it too acted

promptly.  Specifically it points to the fact that within a week after the loss occurred, it sent Thoele

a letter informing him that Landmark was reserving its right to deny coverage (Doc. 73-10, Exh. H).

Therein, Landmark did not provide any specific basis for a potential rescission, but rather stated,

"Based on information received to date, it appears that a question or questions of coverage may exist

for the claimed damage at the Green Lantern Roadhouse, LLC.  Landmark intends to reserve its

rights on all bases."

        The Court finds **Coregis** distinguishable from the facts here.  In **Coregis**, once the

insurance company learned of the misrepresentation, the insured was immediately notified that

coverage would not be renewed.  Upon Hubka's request for a defense in the malpractice action, from

which the misrepresentation arose, the insurance company immediately notified Hubka that it was

reserving its rights to deny coverage based upon specific exclusions in the policy.

        But Landmark did not immediately notify Green Lantern that it might rescind the

contract when it first learned of the lack of a central station fire alarm.  Landmark had knowledge

that the premises were not protected by a central station fire alarm as of its receipt of the December

27th application.[6]  To be sure, the application stated that such an alarm would be activated at some

point and Landmark may well have relied on this representation in assessing the value of the risk.

But it did not require the installation of a central station fire alarm as a condition of the policy, nor

did it ever provide Green Lantern a date certain by which any such system must be installed.  In fact,

_____

        [6] Earlier, the Court addressed Landmark's contention that it relied only on the December
14th application and was unaware of the modifications included in the December 27th signed
application, when it bound coverage.  The Court determined that the representations on the
December 27th application controlled.  But even if the Court had found that the December 14th
application controlled the misrepresentation issue, the Court could still consider the December 27th
application with respect to the waiver issue.  At a minimum, Landmark obviously had constructive
knowledge upon receipt of that application because it stated that Green Lantern was not equipped
with an operational central station fire alarm.

Landmark never indicated by any means that the lack of a central station fire alarm was a problem.

Moreover, after the February 1, 2007 inspection, Landmark had knowledge that the premises still lacked a central station fire alarm. And despite the fact that it gave Green Lantern a list of requirements for continuation of coverage, Landmark neither recommended nor required that Green Lantern activate a central station fire alarm by a date certain. Again, Landmark made no comment on the issue whatsoever. Nonetheless, Landmark continued to accept premiums and made no indication that coverage depended on the presence of a central station fire alarm after the loss occurred, which was also halfway through the policy's duration.

In light of these circumstances, the Court finds that Landmark did not act promptly to rescind the policy. Landmark could have required a central station fire alarm as a condition of the policy, provided Green Lantern with a date certain by which an alarm must be installed, cancelled the policy after the inspection report, or refused to insure the risk in the first place. It chose not to take any of these approaches. Despite the fact that Landmark was aware that there was no central station fire alarm, it continued to accept premiums and never required Green Lantern to correct the situation. It would be unjust and inequitable to permit Landmark to rescind the contract based on facts that it was aware of yet chose not to address.

Furthermore, to hold differently might signal to others in the insurance industry that rescission is available if one willing to bury his head in the sand. This Court declines to create a safe haven for insurers who wish to collect premiums despite a known risk in the hope that catastrophe will not occur, yet rescind the policy if it does. While the Court does not find that Landmark acted with any sinister intent here, the Court does not wish to sanction such behavior.

As no genuine issue of material fact remains, the Court finds that Landmark waived

its right to rescind the policy and must provide coverage under the policy.

## 4.  Whether Kratt is an Additional Insured

Having determined that Landmark must provide coverage as to Green Lantern's loss, is liable under the policy, the final question before the Court is whether Defendant Kratt is an additional insured under the policy.  Kratt filed a counterclaim against Landmark seeking recovery under the Green Lantern policy as an additional insured (Doc. 14).  Kratt's motion for summary judgment asks the Court to determine that she is in fact an additional insured (Doc. 72).  While Landmark does not contest Kratt's status as an insured in its response to her motion, Green Lantern claims that she is not an additional insured under the explicit language in the policy.  As a result, Green Lantern claims that it is the only party that can recover for the loss at issue.  However, neither Green Lantern nor Kratt filed a crossclaim against the other.

The Supreme Court of Illinois has clearly explained that

> [i]nsurance policies are subject to the same rules of construction applicable to other types of contracts.  A court's primary objective is to ascertain and give effect to the intention of the parties as expressed in the agreement.  In performing that task, the court must construe the policy as a whole, taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract.

*Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 860 N.E.2d 280, 285–86 (Ill. 2006) **(citations omitted).**  Thus, the Court must apply the plain and ordinary meaning of the contractual terms where the policy is unambiguous.  However, the Illinois Supreme Court cautioned that

> because insurance contracts are issued under given circumstances, they are not to be interpreted in a factual vacuum.  A policy term that appears unambiguous at first blush might not be such when viewed in the context of the particular factual setting in which the policy was issued. . . . Where ambiguity does exist, the policy will be construed strictly against the insurer, who drafted the policy . . ., and liberally

in favor of coverage for the insured.

***Id.*** **at 286 (citations omitted).**

The relevant facts regarding this issue are as follows. Kratt purchased the property in question from Buennemeyer in 2002. In 2006, Kratt entered into a lease with Green Lantern Roadhouse, LLC as to that same property. In December 2006, Green Lantern obtained the insurance policy at issue here from Landmark. The policy has two coverage parts: a Commercial Property Coverage Part and a Commercial General Liability Coverage Part. With respect to the Commercial Property Coverage Part, the following policy limits were included: $449,300 for the building, $90,000 for business personal property, $100,000 for business income, $5,000 for spoilage, and $20,000 for the sign (Doc. 2-3, p. 5).

Green Lantern is named as the insured as to both coverage parts. The policy also contains two identical pages, which appear to be duplicates, that identify Linda Kratt and Louis G. Buennemeyer as additional insureds under the Commercial General Liability Coverage Part only (Doc. 2-3, pp. 4 & 25). There is no separate form stating that Kratt and Buennemeyer are additional insureds as to the Commercial Property Coverage Part. However, the policy also includes an endorsement dated February 16, 2007, which "modifies insurance provided under . . . all coverage parts applicable to this policy" (Doc. 2-3, p. 3). That policy change states:

> In consideration of the premium charged, it is agreed that the mailing
> address for the Additional Insured, Linda Kratt, is amended to read:
> P.O. Box 822, Robinson, IL 62454

The parties agree that it is the Commercial Property Coverage Part that affords coverage in this case.

Having fully reviewed the policy and considering the factual context in which the policy was issued, the Court finds that it is ambiguous with respect to the status of Kratt as an

additional insured. First, it is not clear why the policy includes duplicate endorsements identifying Kratt as an additional insured under only the Commercial General Liability Coverage Part (Doc. 2-3, pp. 4 & 25). In light of the policy change, it appears that one of these endorsements may have been meant to provide coverage for Kratt ans an additional insured under the Commercial Property Coverage Part. Additionally, it is unclear why the building was insured for $449,300 in the Commercial Property Coverage Part if only the lessee, rather than the owner, was an insured under the policy. Consequently, the Court finds that the policy is susceptible to more than one meaning with respect to Kratt's status as an insured so as to create an ambiguity. As a result, the Court now considers extrinsic evidence in order to determine the parties' intent.

Green Lantern offers no position as to how any such ambiguity could be resolved in its favor. Nor could it, since there is a wealth of evidence that the parties intended that Kratt would be an additional insured under the policy. First, the applications submitted on December 14th and 27th by Ron Thoele on behalf of Green Lantern sought coverage for Kratt. Under "Additional Interests," the application identifies both Buennemeyer and Kratt (Doc. 73-8). It seems disingenuous for Green Lantern to claim that Kratt was never intended as an additional insured when its own application sought coverage for her as an additional insured. Indeed, even Landmark appears to accept that Kratt is an additional insured under the policy, as it does not oppose her motion for summary judgment on this particular basis.

Also, Weis issued an insurance binder to Kratt and Buennemeyer on December 28, 2006, which conveyed coverage limits related to the Commercial Property Coverage Part (Doc. 74-6, pp. 14 & 15). Furthermore, Haarmann contacted Geo F. Brown on the date of the loss and noted that it was intended that both Kratt and Buennemeyer were to be insured under the policy (Doc. 74-6

pp. 2 & 3).  These factors clearly indicate that the parties intended that Kratt be an additional insured on the date the policy was issued.

Additionally, while the endorsement amending Kratt's address in the policy does not explicitly state that Kratt is an additional insured under the Commercial Property Coverage Part, Landmark did identify her as "the Additional Insured" and checked the box indicating that the policy change pertained to "All Coverage Parts of the Policy."  Though not dispositive, this does indicate that the parties intended that Kratt be an additional insured under the entire policy.

Moreover, as already suggested above, the high policy limits on the property also indicate that the property owner, Kratt, was intended to be an additional insured.  Green Lantern offers no explanation as to why the policy would provide such extensive coverage for the lessee where the owner is not an additional insured.

The parties also agree that either Kratt or her boyfriend Mike Thoele, who also happens to be Ron's brother, directly submitted premiums to Landmark each month, except for once when Ron submitted the premium (Ron Thoele Dep., Doc. 77-6, Exh. C, pp. 108–10; Kratt Dep., Doc. 74-2, Exh. A, p. 30; Haarmann Dep. Doc. 77-8, Exh. D, p. 248).  Though Ron claims that he actually paid Mike for the premiums by giving him "a substantial amount of equipment," there is nothing to substantiate that assertion (Ron Thoele Dep., Doc. 77-6, Exh. C, pp. 108–10).  In any case, Kratt's direct participation in the payment of premiums indicates that the parties intended that she be an additional insured.

Having considered the circumstances surrounding the issuance of this policy, the Court finds that an ambiguity exists as to whether Kratt is an additional insured.  In resolving that ambiguity, the Court finds that Kratt is in fact an additional insured and is entitled to coverage under

the policy.

Because the Court has already determined that Landmark waived its right to rescind the policy, the Court need not address Kratt's argument that she can recover under the policy as an innocent insured.

### E.  Conclusion

For the reasons thoroughly explained above, the Court finds that (1) Green Lantern's breach of the condition that it maintain a central station burglar alarm does not entitle Landmark to rescind the policy, (2) Green Lantern's statements on its application as to the existence of a burglar alarm do not constitute a false warranty, (3) regardless of whether Green Lantern's application included any material misrepresentations with respect to the existence of a central station fire alarm, Landmark waived rescission and is therefore liable to pay for damage to the property pursuant to the policy, and (4) Linda Kratt is an additional insured under the policy and is entitled to coverage.

Consequently, the Court hereby **DENIES** Landmark's motion for summary judgment (Doc. 73), **GRANTS** Kratt's motion for summary judgment (Doc. 72), and **GRANTS IN PART AND DENIES IN PART** Green Lantern's motion for summary judgment (Doc. 75).  Accordingly, judgment is to be entered in favor of Kratt and Green Lantern as to their counterclaims on the issue of liability, and against Landmark as to its claim for declaratory judgment.

The only issue remaining before the Court is the amount of damages.

**IT IS SO ORDERED.**

**DATED this 18th day of February 2009.**

> **s/ Michael J. Reagan**
> **MICHAEL J. REAGAN**
> **United States District Judge**